IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARLENE BRENGLE           :

                                :

    v.                      :   Civil Action No. DKC 10-2133

                                :

GREENBELT HOMES, INC.      :

                                :

**MEMORANDUM OPINION**

Presently pending and ready for review in this Fair Housing Act case is the motion of Defendant Greenbelt Homes, Inc. to dismiss count III of Plaintiff's amended complaint (ECF No. 13). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion will be denied.

**I.    Background**

Plaintiff Darlene Brengle initiated this lawsuit against Defendant Greenbelt Homes, Inc. ("GHI") on August 3, 2010. (ECF No. 1). Her amended complaint asserts three counts: count I alleges that GHI discriminated against her in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.;* count II alleges that GHI is liable for negligence; and count III alleges that GHI is liable for intentional infliction of emotional distress

("IIED").[1]  GHI has moved to dismiss only count III and accordingly this memorandum is limited to a discussion of the alleged facts relevant to that count.

Ms. Brengle is a fifty-four year old woman disabled by kidney disease and respiratory and immune system disorders. (ECF No. 11 ¶ 1).  GHI is a non-profit corporation and housing cooperative consisting of approximately 1,600 homes, including townhouses, attached homes, and related common areas in Greenbelt, Maryland.  (*Id.* ¶ 7).  From November 1999 until May 20, 2009, she resided within the GHI community at 52A Ridge Road, Greenbelt, Maryland.  (*Id.* ¶ 6).  Since 1999, Ms. Brengle's sole source of income has been social security disability insurance benefits.  Ms. Brengle alleges that GHI was aware of her disabilities and her source of income at the time she moved into the community.  (*Id.* ¶¶ 6, 9).  She also alleges that prior to moving into the community, she obtained assurances from GHI's management that it did not use the kinds of pesticides that caused severely adverse health effects for her when she was exposed to them in 1993.  (*Id.* ¶¶ 10-11).

---

[1] Ms. Brengle's initial complaint contained the same three counts.  GHI moved to dismiss count III of the initial complaint on October 22, 1010 (ECF No. 9).  Rather than opposing the motion, Ms. Brengle filed an amended complaint on November 5, 2010.  (ECF No. 11).

In October 2007, Ms. Brengle learned that GHI was considering using certain toxic chemicals to eliminate bamboo and other invasive plants in areas near to her unit. (*Id.* ¶ 13). At that time she asked GHI to refrain from using pesticides or herbicides near her home because of the potential adverse effects on her health. Along with her request she submitted a letter from her doctor stating that "exposure to pesticides and herbicides 'will greatly jeopardize her health and possibly cause irrevocable damage' because Ms. Brengle's fragile health left her 'unable to metabolize these [chemicals] adequately and therefore [she] can have more severe reactions.'" (*Id.* ¶ 14). Beginning in October 2007, Ms. Brengle also contacted her neighbors, the GHI Board of Directors, and GHI management about the potential harm to her from the use of the proposed chemicals, had a letter published in the local paper, gathered signatures from neighbors for a petition protesting the use of the pesticides, and engaged in other activities to notify the GHI staff and Board of her concerns. (*Id.* ¶ 15). Ms. Brengle alleges that, in response, the GHI Board members, management, and staff "belittled her; expressed skepticism about the effect of the chemicals on her health; provided incomplete and misleading information concerning chemicals to be used; impugned her character and falsely accused her of gaining access to a GHI office without permission; and insisted that GHI would

continue to use pesticides and herbicides if its Board of Directors deemed it advisable." (*Id.* ¶ 17). Nevertheless, GHI also made written and oral promises to provide Ms. Brengle with advance notice before applying the chemicals so that she had an opportunity to be absent from the premises during those times. (*Id.* ¶ 17).

Despite these assurances, on May 20, 2009, GHI permitted a contractor to apply the pesticide "Phantom" to the unit immediately below Ms. Brengle's unit. (*Id.* ¶ 19). GHI did not provide Ms. Brengle with advance warning, but she happened to be away from her unit at the time. Within moments of her return to the building she experienced "a strong and painful burning sensation on her face and in her eyes and throat and she developed a severe headache and nausea." (*Id.* ¶ 21). Shortly thereafter she experienced respiratory distress and "acute airway obstruction to the point she nearly stopped breathing" and was taken to the emergency room. (*Id.* ¶¶ 22-23). At the hospital, tests confirmed that she had been exposed to toxic chemicals and had an acute asthma attack, and she was advised not to return to her home until the chemicals were removed. (*Id.* ¶¶ 23-24). In the following weeks, Ms. Brengle consulted five other physicians regarding her condition. They concluded that the chemical exposure exacerbated a number of her conditions and diagnosed her with chemical poisoning, reactive

upper and lower airway disease of severe degree, significant toxic encephalopathy, and mild peripheral neuropathy. (*Id.* ¶¶ 27-28).

On May 22, 2009, Ms. Brengle notified the General Manager of GHI, Gretchen Overdurff, about her reaction to the pesticide and her doctor's recommendation not to return until the chemicals had been removed. Ms. Brengle also informed Ms. Overdurff that she was "out on the street" and needed GHI to provide alternative housing, either in a motel or permission to stay in GHI's "Guest House", but Ms. Overdurff said "there was nothing" she could do. (*Id.* ¶¶ 29-32). GHI made no efforts to provide alternative housing for Ms. Brengle or to assist her with cleaning up or mitigating the effects of the chemical exposure, at that time or thereafter. (*Id.* ¶ 33). At her own expense, Ms. Brengle's unit was thoroughly cleaned by GreenLight Cleaners on June 24, 2009, but a chemical residue remained. (*Id.* ¶¶ 34-36). Ms. Brengle has not lived in her unit since May 20, 2009, and cannot spend more than ten minutes in the unit without experiencing symptoms similar to those she experienced on May 20, 2009. (*Id.* ¶ 37). She has been sleeping in her car or staying with friends in Greenbelt and Lanham, and she has been unable to use nearly all of her possessions, valuables, and keepsakes that were in the unit because they have traces of the chemical residue. (*Id.* ¶¶ 39, 41).

In count III of her amended complaint Ms. Brengle alleges that "through its mistreatment . . . and its extreme callousness, and by exposing her to toxic chemicals despite her repeated warnings that such exposure could be extremely harmful to her health and well-being, GHI caused [her] severe emotional distress." (*Id.* ¶ 43). She alleges that she is "often overcome physically and emotionally by the enormity of these difficult circumstances, and by anxiety, fear and distress about not being able to recover both physically and financially and to get back into stable housing." (*Id.*). She further alleges that her distress "is debilitating and prevents her from being able to interact with others and attend to basic requirements concerning sleep and diet, which further affects her physical health" and that her emotional distress "is further exacerbated by her loss of a stable living environment or any semblance of a 'home.'" (*Id.* ¶¶ 67-68).

GHI moved to dismiss count III of the amended complaint on November 22, 2010, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. (ECF No. 13). Ms. Brengle opposes the motion. (ECF No. 14).

## II. Analysis

### A. Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's

complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(internal citations omitted).

In its determination, the court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999)(citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory

factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

**B. Analysis**

The tort of intentional infliction of emotional distress was first recognized by the Maryland Court of Appeals in *Harris v. Jones*, 281 Md. 560 (1977). To recover for IIED under Maryland law, a plaintiff must show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme or outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress is severe. *Id.* at 566; *see also Interphase Garment Solutions, LLC v. Fox Television Stations, Inc.*, 566 F.Supp.2d 460, 466 (D.Md. 2008)(citing *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 58 (1986)). All four elements must be established, and the liability for the tort should be imposed

sparingly, "its balm reserved for those wounds that are truly severe and incapable of healing themselves." C*aldor, Inc. v. Bowden*, 330 Md. 632, 642 (1993)(quoting *Figueiredo-Torres v. Nickel*, 321 Md. 642, 653 (1991)).

GHI argues that Ms. Brengle has failed to plead adequate facts to establish an IIED claim. Specifically, GHI contends that Ms. Brengle has failed to allege facts sufficient to establish three of the requisite elements—that GHI's conduct was intentional or reckless, that its conduct was extreme and outrageous, and that Ms. Brengle suffered extreme emotional distress. (ECF No. 13-1). Ms. Brengle disagrees and maintains that she sufficiently pled each element of her claim. (ECF No. 14-1, at 1). Each contested element will be discussed in turn.

### 1. Intentional or Reckless Conduct

To satisfy the first element of an IIED claim, a plaintiff must demonstrate that the defendant either "desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow." *Interphase Garment Solutions, LLC*, 566 F.Supp.2d at 466 (quoting *Foor v. Juvenile Servs. Admin.*, 78 Md.App. 151, 175 (1989)).

Ms. Brengle argues that GHI was made well aware that exposure to pesticides would have severe and adverse health consequences for her, including severe emotional distress, and, thus, its decision to use Phantom near her unit "cannot be considered anything less than an act of reckless disregard." (ECF No. 14-1, at 6). In support, Ms. Brengle points to paragraphs 14, 16, and 63 of her amended complaint, where she alleges that she "informed GHI of the potentially grave effects of pesticides and herbicides on her health," (ECF No. ¶ 3), that "GHI was fully apprised of the severe physical and emotional distress Ms. Brengle was likely to experience if she were to be exposed," (*id.* ¶ 16), and that "by violating its prior promises of advanced warnings, allowing a pesticide to be applied to the unit neighboring Ms. Brengle's and failing to give Ms. Brengle any prior notice of the chemical use, GHI intentionally caused Ms. Brengle significant emotional distress or acted with reckless disregard for the strong likelihood that Ms. Brengle would suffer emotional distress." (*Id.* ¶ 63). Although Ms. Brengle does not allege the details of her conversations with GHI or fully specify exactly what health risks GHI was informed were a possible result of her exposure, she has pleaded sufficient facts to establish the plausibility of this element.

## 2. Outrageous or Extreme Conduct

To satisfy the second element, the conduct in question must "completely violate human dignity," and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Interphase Garment Solutions, LLC*, 566 F.Supp.2d at 466 (quoting *Hamilton*, 66 Md.App. at 59-60); *see also Kohler v. Shenasky*, 914 F.Supp. 1206, 1212 (D.Md. 1995)("For conduct to be 'extreme and outrageous,' it must go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community." (internal quotations omitted). "The mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 672 (1992).

In evaluating whether the identified conduct is extreme and outrageous, courts should consider multiple factors, including the context in which the conduct occurred, the personality of the plaintiff and her susceptibility to emotional distress, and the relationship between the defendant and plaintiff. *See, e.g., Moniodis v. Cook*, 64 Md.App. 1, 17, *cert. denied*, 304 Md. 631 (1985); *Figueiredo-Torres*, 321 Md. at 654. "[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power

to affect his interests." 281 Md. at 569 (citing Restatement (Second) of Torts § 46 comment e (1965)). Furthermore, "[i]n cases where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized by the courts." *Id.* at 569 (citing 1 F. Harper & F. James, Jr., The Law of Torts § 9.1 at 666-67 (1956); W. Prosser, Handbook of the Law of Torts § 12 at 56 (4th ed. 1971)); *see also Figueiredo-Torres*, 321 Md. at 654 (recognizing that a psychologist is in a unique position to influence a patient's emotional well-being and their conduct must be closely scrutinized); *Kentucky Fried Chicken Nat'l Mgmt.*, 326 Md. 663, 677 (1992)(recognizing that the employer/employee relationship may be significant factor in determining whether there is liability for tort of IIED). Where reasonable jurors may differ as to whether the defendant's conduct may be regarded as extreme and outrageous, the question should be submitted to a jury. *Harris*, 218 Md. at 569; *Jackson v. Kimel*, 992 F.2d 1318, 1324-25 (4th Cir. 1993). Thus at the pleading stage, a plaintiff need only allege conduct that a reasonable juror might deem extreme or outrageous.

In this case, Mr. Brengle alleges that it was extreme and outrageous for GHI recklessly to expose her to chemical poisoning after repeated warnings that doing so would cause her significant and permanent physical and emotional harm and for

GHI to refuse to permit Ms. Brengle to stay in GHI's guest unit or otherwise assist her with finding alternate housing with the knowledge that Ms. Brengle was effectively homeless. (ECF No. 14-1, at 11)(citing ECF No. 11 ¶¶ 16, 30-33, 43, 63-65). Ms. Brengle also notes that there are prior cases, including controlling precedent, holding that one who engages in conduct that is "highly likely" to result in another's affliction with a serious illness with permanent health consequences has committed extreme and outrageous conduct. (*Id.* at 11)(citing *B.N. v. K.K.*, 312 Md. 135, 146-48 (1988); *Gonzalez v. Moffitt*, 178 F.3d 1294 (6th Cir. 1999)(unpublished); *German v. Fed. Home Mortg. Corp.*, 885 F.Supp. 537, 571-72 (S.D.N.Y. 1995); *Leonard v. BASF Corp.*, No. 06-cv-00033, 2006 WL 3702700, at *9 (E.D.Mo. Dec. 13, 2006); *Amica Mut. Ins. Co. v. Henderson*, No. 02-cv-5193, 2003 WL 21196261, at *3-4 (N.D.Ill. May 15, 2003); *Abbatiello v. Monsanto Co.*, 522 F.Supp.2d 524, 536 (S.D.N.Y. 2007)). In *B.N. v. K.K.* and *Gonzalez v. Moffit* defendants who knowingly exposed plaintiffs to the risk of acquiring sexually transmitted diseases were held to have committed extreme and outrageous conduct. In *German v. Federal Home Mortgage Corp.*, *Leonard v. BASF Corp.*, *Amica Mutual Insurance Co. v. Henderson*, and *Abbatiello v. Monsanto Co.* the defendants were alleged knowingly to have exposed plaintiffs to chemicals or toxins in their homes and failed to provide

adequate warning or concealed the danger. In each case, the court deemed the allegations sufficiently extreme and outrageous to survive motions to dismiss. *See German,* 885 F.Supp. at 571-72 (denying motion to dismiss where landlords knowingly exposed tenants to lead paint, "a highly toxic substance to children," thereby putting them at risk for physical and mental injuries); *Leonard*, 2006 WL 3702700 at *9 (denying motion to dismiss IIED claim where defendant knowingly exposed plaintiff to dangerous levels of carcinogens at the manufacturing plant where he was employed causing plaintiff's colon cancer); *Amica Mut. Ins. Co.*, 2003 WL 21196261, at *3-4 (denying motion to dismiss IIED claim where defendants allegedly failed to warn plaintiffs of toxic mold in their home); *Abbatiello*, 522 F.Supp.2d at 536 (finding that an allegation that defendants knowingly subjected individuals to exposure to the highly toxic substance, PCB, "while purposefully concealing from those so exposed the serious injuries that might result from such exposure, and in reckless disregard of these risks, may constitute 'extreme and outrageous' conduct").

GHI argues that Ms. Brengle's allegations are insufficient because there is no allegation that she suffered from any emotional or psychological ailments that made her vulnerable to emotional distress and because breaching promises or engaging in conduct that a defendant knows will cause physical harm does not

rise to the level of outrage necessary to find liability for the tort. (ECF No. 13-1, at 18-20). GHI also attempts to distinguish the facts alleged here from the cases where IIED claims have survived motions to dismiss or for summary judgment. (ECF No. 15, at 11-15).

The alleged conduct in this case is perhaps not as extreme or outrageous as the conduct in the cases cited by Ms. Brengle, but this is also more than a run-of-the-mill breach of contract or physical tort case. Ms. Brengle went to great lengths to convey to GHI the potential harm to her health that would result from her exposure to pesticides or other toxic chemicals.[2] Her

_____

[2] GHI contends that Ms. Brengle's factual allegations relate only to GHI being told that exposure to chemicals would put her at the risk of physical harm and make no reference to emotional harm. (ECF No. 15, at 15). The paragraph of the amended complaint then referenced by GHI reads:

> In October and November 2007, Ms. Brengle asked GHI not to use pesticides or herbicides in, or in the vicinity of, her unit, and informed GHI of the potentially grave effects of pesticides and herbicides on her health. Her request was subsequently supported by a letter from her doctor in November 2007, indicating that exposure to pesticides and herbicides "will greatly jeopardize her health and possibly cause irrevocable damage" because Ms. Brengle's fragile health left her "unable to metabolize these [chemicals] adequately and therefore [she] can have more severe reactions.

conduct and fervor in protesting the chemicals' proposed use should have conveyed to GHI her deep emotional investment in the issue and that her sensitivity to the issue was far greater than the average resident.  With that knowledge, GHI proceeded to apply the pesticides without advance warning and then refused to assist Ms. Brengle in finding alternate housing or otherwise alleviating or remedying her situation.  The allegations in this case rise above the level of mere insults, annoyances, or simple rudeness.  *See B.N.*, 538 A.2d at 1181; *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 502 A.2d 1057 (finding bad taste and poor judgment in connection with the collection of a lawful debt did not amount to extreme and outrageous conduct), *cert. denied*, 306 Md. 118 (1986).  While the conduct may ultimately be found insufficiently outrageous or extreme to permit recovery, the allegations are sufficient to proceed at this stage.

### 3.  Extreme Emotional Distress

To satisfy the fourth element, one must suffer "a severely disabling emotional response to the defendant's conduct." *Harris*, 281 Md. at 570.  But "while the emotional distress must be severe, it need not produce total emotional or physical

---

(ECF No. 11 ¶ 14.)  This paragraph refers to grave effects on Ms. Brengle's "health."  Health is not obviously limited to physical health, but rather the term is broad enough to encompass mental and emotional health as well.

disablement" and "severity must be measured in light of the outrageousness of the conduct and the other elements of the tort. *B.N.*, 312 Md. at 147 (citing *Reagan v. Rider*, 70 Md.App. 511, 513-14). The Maryland Court of Special Appeals' decision in *Moniodis* v. *Cook*, provides a clear illustration of the level of distress which is necessary to recover for IIED. 64 Md.App. 1. In *Moniodis* four employees filed IIED claims against a former employer that had required all its employees to submit to polygraph tests regarding inventory shortages and terminated the plaintiffs when they refused to take the tests. Although the jury returned favorable verdicts on the IIED claim for all four plaintiffs, the court overturned the verdict as to three plaintiffs whose evidence of emotional disablement was testimony that they were upset and suffered symptoms such as hives, increased smoking, and lost sleep, but who ably managed to take care of their households and tend to daily activities. *Id.* at 15-16. The evidence regarding the fourth employee, however, demonstrated deep emotional disturbance. The *Moniodis* court explained:

> There was evidence that she did suffer from a pre-existing nervous condition; her emotional state, however, deteriorated significantly after her termination. She took greater amounts of medication and began to sleep most of the time. She became a recluse, her husband testified, and did not "come out of it" for a year. Relatives came to the home to tend to household chores

> which Ms. Cook could no longer perform. She
> took pains to avoid contact with neighbors
> who might ask her why she no longer worked
> at Rite-Aid.

*Id.* at 16. The court held that this evidence was "more than enough to permit a jury finding that [the plaintiff] was severely distressed." *Id.* Similarly, in *Caldor Inc. v. Bowden*, the Maryland Court of Appeals held that where a plaintiff was "upset," "embarrassed," "confused," and "felt bad about himself" there was insufficient evidence of a severely disabling emotional response. 330 Md. 632, 644 (1993). In contrast, the plaintiff in *Figueiredo-Torres* demonstrated severe emotional distress where he suffered:

> systemic hypertension and loss of visual
> acuity in his left eye, required
> hospitalization for severe emotional
> distress, shock and fright to his nervous
> system; he suffered depression, anxiety,
> obsession ... and impairment of his ability
> to form intimate relationships with women,
> all said injuries requiring psychological
> therapy and counseling; he lost the benefit
> received from prior psychological
> counseling.

321 Md. at 656. Although the facts of each case will be unique, these examples illustrate the severity of the emotional distress that one must plead.

Here GHI contends that the allegations in the amended complaint do not state facts showing that Ms. Brengle's emotional distress was severely disabling and that mere

conclusory allegations to that effect are insufficient. (ECF No. 13-1, at 13). Ms. Brengle's complaint contains more than conclusory allegations. In addition to alleging that she experienced "severe anxiety," "isolation," "extreme sadness," and "devastation," (ECF No. 11 ¶¶ 44, 49), Ms. Brengle has alleged that the distress is debilitating and it has prevented her from attending to basic requirements of life such as having a permanent home and eating and sleeping regularly and interacting with others. (*Id.* ¶ 67). It is true that the facts proven may ultimately show that these conditions were not caused by the defendant's actions or details may emerge in discovery that indicate a more limited level of disruption in Ms. Brengle's life, but taking the facts as pled she has alleged a severe level of emotional distress. Ms. Brengle's amended complaint contains more than the bare allegation that she suffered severe emotional distress and is thus distinguishable from the bare bones allegations that were deemed inadequate in the recent cases cited by GHI. (ECF No. 13-1, at 15)(citing *Templeton v. First Tenn. Bank, N.A.*, No. WDQ-09-3280, 2010 WL 2292493 (D.Md. June 3, 2010); *Hinks v. Bd. of Educ. of Harford Cnty.*, No. WDQ-09-1672, 2010 WL 1664084 at *5 (D.Md. Apr. 20, 2010), *modified by* No. WDQ-09-1672, 2010 WL 5087598 (D.Md. Dec. 7, 2010)(changing prior order granting dismissal to one without prejudice and permitting plaintiff to file amended complaint);

and *Ragland v. A.W. Indus., Inc.*, No. DKC-08-1817, 2009 WL 2507426, *13 (D.Md. Aug. 13, 2009)).  In these cases the plaintiff alleged only that he or she suffered "severe . . . mental anxiety" and "extreme emotional distress for which she incurred medical costs," *Templeton*, 2010 WL 2292493 at *5, or that she suffered "severe emotional distress" with no information about the extent of that distress.  *Ragland*, 2009 WL 2507426 at *13; *see also Hinks*, 2010 WL 1664084 at *6 (sole allegation about plaintiff's emotional distress was that "Defendants' misconduct has proximately caused the Plaintiff to suffer extreme emotional distress and physical manifestations thereof").  Ms. Brengle's complaint includes these allegations in addition to facts to explain the extent of her distress, and, thus, she has met the pleadings standards of Fed.R.Civ.P. 8.

## III. Conclusion

For the foregoing reasons, Defendant's motion to dismiss count III of the amended complaint will be denied.  A separate Order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
